23-3630, Parents Defending Education v. Olentangy Local School District et al. Oral argument as follows, 15 minutes for the plaintiff, 5 minutes for the state, 20 minutes for the defendants. Mr. Gaser for the, I'm sorry, Mr. Norris for the plaintiff appellant. Good afternoon. Good afternoon, Chief Judge Sutton, Cam Norris for the appellant, Parents Defending Education. I'd like to reserve three minutes for rebuttal, and may it please the court. Pronouns express a viewpoint on gender identity, what Meriwether calls a contentious political debate. Olentangy is free to take a side in that debate by expressing its own view that a child's gender identity should always be affirmed, but it's not free to punish students who dissent, who calmly and respectfully believe that sex is immutable and refuse to use words they deem harmful and false. Olentangy can't declare that traditional religious views on gender identity are now unspeakable discrimination or harassment. It especially can't do so with zero evidence of disruption in the record based only on subjective appeals to common sense. Common sense says that Olentangy's policies aren't helping students by compelling their peers to parrot words they don't really believe. They are harming students by teaching them that different worldviews should be silenced and banned, not understood and rebutted. This court should reverse the denial of our motion for a preliminary injunction. So how do you distinguish Morris v. Frederick with your legal rule that school districts are not allowed to engage in viewpoint discrimination? That case was clearly about viewpoint discrimination and the court said schools can adopt anti-drug policies, but they can adopt policies prohibiting students from promoting drug use, but students can discourage drug use. It seems like that's clearly viewpoint based, which suggests to me that maybe viewpoint discrimination is allowed in this context. So the way I read this court's decisions in Barr and Castorina is that if you're in the tinker zone, if that's what the school has to rely on, it also has to not be viewpoint discriminatory. However, Morris is an exception from tinker entirely for drugs. So isn't that somewhat unsatisfying? So you think there should just be a policy-rooted First Amendment exception for drugs, and that's the way you would describe it? I'm not sure I would have voted that way in that case, but that is the law that the Supreme Court has given us, and it's very clear. Could we conceivably take the case to establish a broader principle maybe that somehow viewpoint discrimination is sometimes allowed? I don't think so, and there's important caveats in Morris. It didn't say viewpoint discrimination about drugs is okay. The court stressed, and then Justices Alito and Kennedy stressed in their concurrence joining that 5-4 opinion, that there was no political speech. So that opinion actually said it would have come out differently if the student was expressing a political viewpoint about drug policy. There was no political religious speech in that case, and whatever the limits are or the rules are about schools and viewpoint discrimination, Meriwether holds that this particular speech in question here is a matter of public debate and concern, citing the Supreme Court's decision in Janus. That is not the type of thing that schools can viewpoint discriminate with respect to, or I think this Court's cases about the Confederate flag would have come out differently. Those cases are where the Court drew the line against viewpoint discrimination. So I don't think you could take Morris to bless bans on the Confederate flag without substantial evidence of disruption. Do you think the Confederate flag case is, I'm thinking about Defoe, there's a concurrence that's maybe the controlling opinion. That seems to characterize it kind of as racist speech, which is equivalent to kind of vulgar speech, obscenity, whatever, kind of that category as opposed to a political viewpoint. Where does the Confederate flag fit right now? Defoe, I'll have to confess, is a very confusing opinion to us. Like you said, it has a majority opinion that's not a majority that says to the extent the concurrence disagrees, the concurrence is the law. Luckily, you're sitting here on Bach. I think this Court can authoritatively weigh in on the precedential value of that concurrence. But at least even taking the concurrence at face value, it's limited to racially hostile speech, I think is how they extend Morris and Fraser. That's not a faithful extension of those cases. We don't think that Morris is very much limited to drugs. Fraser is very much limited to schools' ability to police speech because it's sexually inappropriate or it's vulgar. There's curse words involved or inappropriate language that's not right for children. But both of those Supreme Court opinions go out of their way to say we're not talking about the expression of political viewpoints. Merriweather holds that this case involves the expression. Is Merriweather a binding case on the en banc court? I think the en banc court sits like this. It's just a panel, isn't it? Just the panel. You get to decide here. Right. I think the short answer is no, but I think this court sits like the U.S. Supreme Court considering its own precedents, which is they're considered binding until someone comes forward and asks you to overrule them, breach the stare decisis factors that you would consider for overruling precedent. I'm struggling with this argument regarding political speech or viewpoint discrimination, if that's how you want to term it, because it seems to me that these policies protect all students, regardless of whether they are transgender or not, and regardless of how they feel or they think about their classmate's transgender identity. And let me just give you an example. Think in terms of a student who strongly believes in transgender identities, becomes convinced that a PDE's child who identified as male is actually a transgender girl, and is simply not admitting it because his parents would disapprove. That student wants to refer to the PDE child as a she and a her, because the student believes this will help the PDE child recognize his true identity as a girl. The PDE child does not want to be referred to as a girl, believes he is a boy, and finds his classmate's behavior traumatic and deeply distressing, and starts skipping school because of it. Isn't he protected by these policies against misgendering just the same as a transgender student is? I think that's a difficult hypothetical, which I understand probably was designed to be difficult, but our students don't believe they have a gender identity. But that's not my question. My question is whether we have a policy here that is discriminatory based on viewpoint, and whether in fact this policy protects all students without regard to their political persuasion, in the school setting, protects them from bullying and misgendering. Right? Right. So I think our students would have a hard time claiming that they were the victims of gender identity discrimination because they don't believe in gender identity. But there is a separate policy. You're losing me. The question is not their belief. In this hypothetical, it may not be true at all. But the question is, where is the harassment coming and on what basis? And in this, isn't this a rule that protects everyone? Irrespective of your argument that this is a political thought rule against wit used to compel these students to do something they don't want to do. But it's exactly the same treatment, is it not, of someone who believes in transgenderism and someone who does not. Because the rule is planned to protect against bullying to the point of making school unavailable to the child that is bullied. Right. So I'll stipulate that that could protect that student in that context. However, that does not make the policy viewpoint neutral. The opposite viewpoint is the use of preferred pronouns. It acknowledges that sex is mutable and that someone's gender can be different from their sex. That remains allowable at Olentangy. You cannot use someone's non-preferred pronouns because they deny the mutability of sex and gender. Other than the fact that they aren't in fact required to select and use those pronouns because there are other options, what about Barr versus LeFron? There we held that a school could ban all racially divisive speech because it was reasonably forecasted to cause substantial disruption while actually allowing racially inclusive speech because it didn't present the key here, more disruption possibility. Right. So I think the policy in Barr was actually on its face viewpoint neutral. It was a ban on disruptive clothing. It basically incorporated the Tinker standard. There's nothing viewpoint based about Tinker on its face. You can get in trouble in the application, but on its face it's not viewpoint based. Here you have policies that ban discriminatory speech, which under RAP makes them viewpoint based. So you have to actually decide that the speech is about gender identity, for example, and that it's negative about gender identity. In my example, the policy applied to someone else who had the two categories of people who had differentiating views of the policy, and I recognize that in Barr the belief in racial inclusivity and a belief in racial exclusion are in some sense opposite viewpoints, but it did not prevent the protection in Barr. So why doesn't that govern here? So at least under the Tinker standard, which is the bare minimum the school has to satisfy, I mean the evidence in Barr was substantial. There were racial hit lists. There were graffiti. The police were called to the school. There were fights. There was an OCR report to the Department of Education. The school had all that evidence in formulating its policy. Here, of course, we have zero evidence whatsoever of even why they adopted the policy, and I think the record suggests that it wasn't even to stop disruption. That was not actually the goal. As you concede, I thought that school – I think this was what Judge Stranch's hypo was getting at. The school had some pretty interesting hypotheticals in the opening of their brief about a male student misidentifying the gender of another male student who's not transgender, calling them by feminine pronouns just to make fun of the student, and it has nothing to do with the political debate. It's just he thought the student was feminine, so I'm going to use feminine pronouns for that student. Do you think that that would be protected under your rule or not? No, so I think if you look at the email, it's about saying something that's inconsistent with another student's identity. I don't think – well, I was trying to say to Judge Stranch that I don't think that's an example of gender identity unless you see the world through the lens of the school. I don't understand your distinction. If you have a boy who's not trans who is looking very girlish and some other student keeps calling that boy girly, girly, girly, which is highly offensive to that student, that is bullying. It is setting a situation where that male student who he knows he's male, everyone knows he's male, your people know he's male, but this one bully keeps calling him girly, girly, girly. Isn't this policy, which is like 10 years old, designed to deal with that kind of situation? Designed? Certainly not. I think it was designed to deal with transgender students. That's the genesis. But if it does cover that situation, it doesn't make it viewpoint neutral because that is not the same viewpoint. That speech is not weighing in on what Meriwether called the contentious political debate about whether males can transition to female or females can transition to male. It may have a viewpoint. I'm not sure. It seems like name-calling and teasing to me. But the viewpoint would be something about is a male sufficiently male, not is a biological female someone who can become or identify as a male. I think that's a different viewpoint. The opposite viewpoint of that remains banned. But, Counselor, you could imagine lots of bullying or harassment that does include a political viewpoint, right? You could imagine people calling Jewish students murderers, right, and part of commentary on current events and things like that. Is your position then that the school can't stop that because that would be, you know, stopping a political viewpoint? No. So, I mean, the injunction that we've asked for is that the school not enforce these policies against students for solely doing what the emails say, purposely using gender language that they know is inconsistent with another student's identity. Solely is important there. So the school has a separate policy, it's 2266, that adopts the Davis Standard for Title IX on sexual harassment. We're not challenging it. That encompasses any severe, pervasive, and persistent harassment that denies someone an education. That remains banned. That can be violated by lots of speech, including political speech. If it arises to the level of conduct where you're actually making the school environment, you know, inhospitable or impossible for a student or causing a substantial disruption. Schools can also have disruption policies. Most schools just ban speech that causes a substantial disruption. They incorporate the Tinker Standard. If you look at the Code of Conduct for Olentangy, the very first violation is a general ban on disruptive speech. We're not challenging it. It would remain in place. If a particular political viewpoint did cause disruption, the school could respond to it. The school also doesn't have to have a policy. You don't need to chill speech in advance. You can just respond reasonably to incidents of disruption that occur. Your challenge to Part 4 of the Code of Conduct on, like, derogatory language, is that the same as your challenge to the other policies, like, that incorporate the bullying and harassment standards and, like, where, you know, to take my hypothetical, again, you're calling, you know, a Jewish kid a murderer or something like that to the level that it hits substantial disruption. The school can't enforce Code 4. It needs to first make a determination that there's a substantial disruption under Tinker. So our arguments are not exactly the same. I think Code 4 is egregiously, facially overbroad. It should be, you could enjoin the entirety of the enforcement of that policy. I think Policy 5517, which has been incorporated into the other policies we challenge, is less overbroad but still on the wrong side of the line. And I think an important point is we talked about Morris and Fraser before. I think there are lots of things schools can do to regulate how students express viewpoints. Fraser says you cannot be indecent or vulgar, even if it's short of actual curse words or sexually graphic language. And so if you're calling a student a murderer, I'm pretty sure the school could ban that under Fraser without any showing of disruption. So we're not trying to get to that speech either. We're talking about what the email says is just the purposeful use of gendered language that a student knows is inconsistent. Isn't there a lot of value laid in then in what we decide is vulgar? That, you know, calling someone a murderer might be vulgar. You know, telling someone they're not the gender that, you know, they think that they are is not vulgar. Like, doesn't that start to get us into some very difficult line drawing problems? Right, and I'm not trying to push everything into the vulgarity bucket because I agree it has that problem. And that needs to have a tight box around it because it does not require showing of disruption. So we're not trying to give schools too much authority there to call everything vulgar. But this speech, I mean, Merriweather says it's a contentious political debate. It very much says that there are reasonable views and reasonable good people on both sides. It's not the type of thing you could call vulgar. I don't think Merriweather was giving college professors the right to express vulgarity or bullying or harassment or discrimination against their students. It was giving them the right to express and not affirm a political viewpoint that they disagree with. When you circle back to Merriweather, do you think that it makes a difference that Merriweather was, in fact, involving a university professor, a state employee, and was being actually analyzed under Pinkerton? It wasn't a tinkering type thing. It wasn't a school environment involving children. Do you think that that makes a difference at all? Sure, yeah. I mean, I think we're not applying pickering here. Pickering, I think government employees, if anything, have fewer rights than students do at K-12 public schools. So I think that makes this a stronger case. But the important points for Merriweather, I mean, Merriweather establishes that the school there didn't have any compelling interest in Title IX because Title IX didn't police the use of pronouns. It establishes that there was viewpoint discrimination going on, which is important because in the K-12 context in this circuit, the rules on viewpoint discrimination apply equally to schools who are relying on tinker. There's talk about why that's compelled speech in Merriweather. I don't think the rules about compelled speech apply any different in the K-12 context. But Merriweather does not resolve the tinker standard, which applies only to the K-12 context. But I think it has lots of helpful— Well, I mean, I think that that's limiting, though, don't you think? Because tinker—disruption is an issue for tinker. Right. I don't think Merriweather gets us all the way home. I just think it gets us almost all the way home on viewpoint discrimination and compelled speech. But if you disagree with us on those two issues, you've got this tinker issue that is open. Let's say that a school allows free discussion of both points of view on this issue. So I like to use the First Circuit facts. You know, a student can wear a T-shirt that says there are only two genders, all right? And in discussion of the topic, the student is free to say whatever he wants about, you know, all these kinds of issues. If that's the case in a particular school, how important is it from a First Amendment standpoint that the same student who's wearing the T-shirt also be able to make speech about another person, let's say another ninth grader, and be able to express his opinion that that ninth grader is, you know, male rather than female, if that's what the ninth grader thinks the ninth grader is? I mean, you know, you can express your opinion, and why not just use— why is it a First Amendment violation if the school says, you know, at that point use the person's name rather than kind of start creating all this potential for disruption or bullying? Sure. So I think, number one, the idea that these policies don't reach anything but pronouns is just— I'm not talking about this case. Okay. You know, let's just say hypothetically that were the case. Okay. So hypothetically, if all that speech was allowed and only pronouns were banned, the school has to follow the same rules on viewpoint discrimination as colleges, like in Rosenberger. That's the precedent of this court. There is no exception to viewpoint discrimination or the First Amendment generally if you only ban one mode of expressing a viewpoint. That is still— Even if you're wearing the T-shirt, you also must have kind of a plenary right to, you know, to describe another person in the class in a way that I think, you know, with the affidavit in this case that you know is demeaning. And, you know, for the school official, it's probably going to have good reason to think this could get into trouble pretty fast. Well— That's what the First Amendment requires even though he's already wearing the T-shirt. I don't think we should understate the importance of the pronouns. I mean, if you have to call someone you believe is a female— No, it's not compelled speech. I mean, let's—I get that. It's just, you know, in lieu of using the person's name. Okay. As in Merriweather, the sort of solution that the professor offered, you know, like— So, I mean, Merriweather says that pronouns are the most powerful way of communicating the message that your belief that sex is immutable. I don't think it's less of a First Amendment problem to ban the most powerful way of communicating the message. So I think it's still a problem for the school. And, you know, again, sorry if I'm fighting the hypothetical.  No, I appreciate your answer. You know, maybe it is the most powerful way. I mean, maybe the T-shirt is more powerful. It's there the whole time. It's pretty unambiguous. You don't have to translate anything, but— Perhaps we could at least agree that the pronouns are protected, and that's important because Tinker says you can have an under-inclusivity problem, too, and that makes the school lose, not win. So if the school is allowing you to go up to someone and say, I do not believe that you are a boy, but is banning you from calling that person he, what interest is being furthered? There is no difference between that speech. The only reason to ban the he is because it communicates the message that you are not a boy. This is why I don't really believe the school when they say that they would allow all those viewpoints, and I don't think they believe it either. If you say anything about a particular student that denies their state of gender identity, that's going to be covered. In fact, the discriminatory— Answer my question. Suppose the student over the summer, between ninth and tenth grade, changes their name from John to Jane. Would your clients, under your view of their rights, your rights, would your clients be able to continue to call that child John, even though they had changed their name to Jane? I believe so. I think we would still be making the same argument. The email that we— You could refuse to call somebody by the name that they wish to be called by. That seems like a very— I wouldn't want someone not calling me by the name that I chose. What if there was a legal name change? I think if the school had a policy that you have to follow the name that's on the legal documents, that could potentially be a viewpoint-neutral policy. That policy would be on an even stronger footing if it was limited to discussions in the classroom, because you have Hazelwood, which talks about speech that could be reasonably perceived as part of the school's own speech, like in presentations and things like that. But in the hallways, if there is a gendered switch in name, I don't think our arguments would change, and I don't think their arguments would change, because their email says any gendered language, not just pronouns, but any gendered language that is not consistent with someone's identity, which I think John to Jane would count. Can we hear from General Geiser? Thank you. Thank you. Good afternoon. Well, good afternoon, Chief Judge Sutton, and may it please the court, Elliot Geiser for the Amici States. Ohio and the 22 other states here have a strong interest in protecting all students, whether transgender or religious, from bullying and harassment. But that does not mean schools can treat one side of a public debate as harassment per se and compel students to speak on the other side. Nor does Ohio's anti-harassment law, Revised Code 33.13.666, require Olentangy's old, overbroad policy. Schools cannot silence dissenters by labeling those dissenters bullies. I would like to start with the compelled speech argument, if I may. I think that when the Supreme Court in Woolley rightly concluded a choice between your car and your conscience is an illusory choice, the choice that is being offered students here, either silence or no use of pronouns whatsoever, or speaking what those students have averred, their parents have averred, would be a lie for them, is just as an illusory choice, and therefore this policy has... What about the option of the name? I think the example that has come out, Ryan said Ryan would do Ryan's homework by Ryan's self. It's ungrammatical and difficult, the kind of slip-ups that are inevitable that this court talked about in the Meriwether decision for the professor there. And let's step back. What a professor is saying at the front of the classroom, an adult who is very experienced, 25 years of teaching, if that professor would have a hard time adhering to a no pronouns at all kind of policy, just use names, I think that a seventh grader is going to have an even harder time not saying his when the school would say it's a violation if that student doesn't say hers, for example. What about my example of over the summer, John deciding that they want to be called Jane? I do think that what is in a name could be something that expresses a viewpoint, and I agree that if there was a viewpoint neutral policy that just says everyone has to use the legal name of every student, that wouldn't be viewpoint discriminatory per se, but my understanding... Preferred name of every student, because I would hazard that many kids in the school have not gone through the effort of legal name change. Well, I agree, Judge Moore, and certainly students should be respectful towards one another. If there were an instance where... Respectful to keep calling someone who wants to be called Jane, to keep calling that person John. Well, it would depend on the intent of the student, and I think there's a difference between... Accident, that's one thing, but if I call... We have several Johns on the bench. We have a Jane on the bench. If I keep calling a John the wrong name after John has changed his name, that would be viewed as offensive, highly offensive. Well, I don't think that you can call that per se harassment and bullying and move the outer boundaries of speech code to the sort of totalitarian enclave. But if you do that in the most respectful way, if you're doing it because it's based on a sincere religious conviction, that that still could be per se harassment, that's nothing like what Ohio law says harassment happens to be. And I think if the court were to narrow the policy through an injunction here to just reflect what the Ohio General Assembly has said is the minimum floor, that would have a viewpoint-neutral, conduct-only, no speech swept into that outside of applications. But just saying something that is insulting or discriminatory language and then defining discriminatory to mean a single intentional instance of using gendered language inconsistent. Have they ever punished a single instance? Or is this not geared as a policy towards disruptive behavior, intentional disruptive behavior? For example, if I mistakenly call you Elise, I'm sorry. I really didn't mean to do that. But if I kept calling you Elise, that would be a different thing. Well, so I do agree that there are instances where you can use gendered language at the level of conduct and harassment. Ohio and the other states don't dispute that. What you can't do is take a preemptive strike and say a single instance. And the speech first case from this court, I think, answers why. Just because there hasn't been a particular instance, that doesn't mean that the speech might not have been chilled in the first instance. And so the pre-enforcement challenge here, the declarations from the parents here, I think, are enough to show these students are in fear that if they express their deeply inheld religious beliefs in the schoolyard, that they could be subject to discipline. So once the First Amendment regulates an activity, courts have to be scrupulous about neutrality. So it cuts both ways of the political debate. But if the First Amendment doesn't enter the field, that gives the states flexibility. So I assume, I'm curious on your position, what if the Ohio legislature passed a law saying the best way to help students with gender dysphoria is to encourage them to accept their biological sex. Therefore, all students should be compelled to refer to those with gender dysphoria by their biological sex. Do you think a student who wants to call other students by their preferred pronouns would have a First Amendment right to do that in violation of that hypothetical law? Yes, Judge Murphy. I think that there's... Why would the state of Ohio want us to enter the field here? Because once the First Amendment applies, neutrality, I suppose, would require that answer. But that is actually limiting your own legislature. Well, I think what the Supreme Court has already held in this area of law in Barnett and what we took the other side in Merriweather. We defended our right to have our state employees speak only as the state would require and the court saw it differently. And so we think that that is now the policy of the state of Ohio, the Merriweather situation. And when it's not a state employee, when these are students, they are not employees of the state that we're dealing with here. These are free and independent citizens in training. And I think the state interest here lies where the Supreme Court said it did in Tinker. Having the free and robust exchange of ideas is critical to the future of self-governing citizens. And I want to be clear that there's a difference between the state endorsing a view and the state enforcing a view. I think that what my friends for the plaintiffs here have said is that Olanchanji is free to take an official side under the delegated authority that the General Assembly has given them in the transgender debate and promote that view through its employee speech. What they cannot do is eradicate dissenting views and compel students to submit to that view by labeling only their preferred pronouns and never using biological pronouns, no matter how sincere and respectful those students happen to be. Even though there are good off-ramps and options. We've talked about wearing T-shirts. We've talked about referring to them by their last name. Your argument, I have some concern about your argument under Merriweather because it feels very much like the policy you are describing is the policy that was in Merriweather. But that's not this policy. The policy in Merriweather required the use of preferred pronouns. And the university required Merriweather to remove all sex-based language and pronouns from his speech or use transgender students' preferred pronouns. And the university threatened to punish the professor if he messed up even once. That's not this policy, counsel. This policy has several options for being able to express thoughts, for calling someone by a last name that is, in fact, their last name. I don't see, I think it concerns me about the whole argument because I think it's a misstatement of what the policy is that's here. And, of course, we are in the pre-enforcement stage here. And that was the choice in bringing this litigation. Well, Judge Strantz, you're right that it's pre-enforcement. Two quick responses, if I may. On page 10 or page 6 of my friends on the other side brief, they reproduced the email here where the school lawyer said, a student purposefully referring to another student by using gendered language they know is contrary to the other student's identity would be an example of discrimination under board policy. When was that letter written? That email was February 17, 2023. Before the alteration in the policy. The policies before us are different, aren't they? They recite the Tinker standard, even those policies, right? Well, I'm really glad that you brought up the change in policy. We don't read those changes in policy to be material. And, at the very minimum, it's held to the bar of voluntary cessation. And I don't think that the new policies would be inconsistent with this email. And I think, at the very least, what this court should say and hold is, that email is a statement of policy, describes a policy that violates the First Amendment. Now, I agree with you, Judge Strantz, that there was more factual matter for the court to look at in Meriwether than here. And because of the pre-enforcement challenge right now. But we do have declarations in this case that have not been refuted. Parent B said, at paragraph 25, this is page ID 374, my children have repeatedly told me they want to go to a school and environment that allows them to express their views. I have watched my children steadily lose self-esteem and self-confidence while they've attended Olentangy schools because of the district's speech policies. And this was filed on... Does the language counselor also recognize that students who are referred to by non-preferred pronouns would consider those insulting, humiliating, dehumanizing, derogatory, unwanted? And didn't CDE also place in this record that therapists explain that students who have been misgendered all day often become traumatized, humiliated, and cry after school? Another article submitted that is in evidence in this record is that a student who does not use gender-affirming pronouns and use ones that are not of their understanding to be who they are are depressed, suicidal, and often self-harming. Well, Judge Strantz... Isn't that part of the record? I'm glad you brought up the record here because those were not submitted by the district. That was a fishing expedition by the district court who did independent research to find that particular law review article. The ones that are in... that I mentioned earlier are the parents' declaration. The PDE parents' declaration. In fact, that was placed in the record along with the therapist explanation. Well, so to return to the question about these... the language about how students might receive pronouns inconsistent with their preferences, there are scare quotes around each of those particular words, that some people might feel that way. It does not say that the students here or their parents agree that it would be dehumanizing because they bear no ill will. And that's the very next sentence, I think, in Parent B's declaration, paragraph 11. This is page ID 371. My children have no ill will against these students. My children just want to express their deeply held views. And then as far as... This is a question, how do they... how are they allowed to express their deeply held views? May they wear a T-shirt? As the new policies say, may they engage in discussions in the classroom regarding their religious or scientific, both sides of the case, understanding of transgenderism. That's allowed under these policies. Well, Judge Strange, I'm a little puzzled by that position that the district here has taken because it's unclear to me how it could be the case that it would not violate the policy for a student to say, I truly believe no person can ever be trapped in a wrong body, that everyone was built the way that God designed them to be. And that that would be considered totally fine viewpoint, just not First Amendment protected, not in violation of the policy. And then that same student could be disciplined for saying Ryan is a he. And I think that that is... I believe in confronting Ryan by saying you are a he, you are not a she. And what does that play into, counsel? It plays into the Tinker Standard. And the Tinker Standard is what will cause disruption. A classroom led by a teacher in which students can express ideas and thoughts is distinct from a single student walking up to another student and saying you are a he, you are not a she. Or in the example I gave, you're pretending to be a he because you don't want your parents to know this, but I know you're a she. Is that not far more likely to satisfy the Tinker Standard because it is likely to result in disruption of the learning environment in a school? Well, so for disruption, I would turn the court's attention to the Mahoney decision where the Supreme Court found that students being upset by one of their classmates using vulgar language at their extracurricular activity, being on the cheerleader team, she used strong language about that, but that upsetness didn't rise to the level of disruption that is needed. That evidence which is in the record, which I believe is more evidence than the school district here has put in the record, was not enough to satisfy the Tinker Standard. And think about Tinker. That Des Moines school district in the height of the Vietnam War was trying to reasonably forecast that maybe some of the students in their classroom who have family members in Vietnam would be harmed or offended, people who are maybe in harm's way or have lost loved ones. But that wasn't enough evidence, that common sense wasn't enough because they didn't have any actual evidence that the students who protested the Vietnam War with the black armbands had actually disrupted anything. How about if in that case, in addition to the armband, which is like the T-shirt, let's say there's a student who had enlisted to join the Marine Corps after high school, and let's say the student who has the armband wants to say something derogatory about people who are willing to go fight in Vietnam, and like you're going to be killing innocent people or something like that. Or they, you know, use a name. There are all kinds of names that those veterans had thrown at them when they come back. I mean, could the student then, you know, going beyond the topic, and now I want to make a comment about an individual, could they do that, do you think? And would that be protected the same way as the armband? Well, so I think statements, if they didn't rise to the level of conduct, which I think is what Ohio law requires school districts to have and is much narrower than what the district policy here is, the school could take action about conduct. I mean, how do you make that distinction? I mean, obviously I'm trying to make an analogy. In that Mahoney, I can't say that case, Mahoney or something, I mean Justice Alito's opinion does make a distinction between speech about the topic and speech that's directed specifically against, among other things, the student. Yeah. I mean, I don't know. I mean, is there a difference? Well, I... Would you agree there's a difference? I agree that there's a difference between punishing actual disruption and a course of conduct, bullying, and just having a preemptive strike that labels one side of the debate as bullying. And I think that, you know, the example that my... That's what I'm talking about. I mean, well, anyway, I already did my half there, so I don't want to take up your time. Well, okay. I mean, you know, the kid's wearing the T-shirt, so you can express that point of view. Well, and I agree that it's not clear that they could do that, but under your hypothetical, I think that's just under-inclusive, that you can have that there is two genders, but if you refer to someone who wants to be called he accidentally or intentionally as she, in the most respectful way, my understanding is that would still violate the interpretation of this policy. And I do think intent and motive really makes a big difference, and school district administrators should have the ability to respond based on intent. They usually can figure that out. They don't need to chill speech in advance with an overbroad policy that takes sides in the culture war. Okay. Thanks. All right. Thanks very much. Thank you. Let's go to the other side. Good afternoon. Good afternoon. Thank you, Mr. Chief Judge Sutton, and may it please the courts, my name is Jamie Santos, and I represent the Olentangy School Board and administrators. K-12 schools have the authority and, more importantly, the duty to maintain a secure environment for kids so they can learn in peace without being bullied, harassed, or made to feel bad about who they are, whether due to their religion, their weight, the fact that they wear secondhand clothes, or their gender identity. As Justice Alito's concurrence in Mahanoy emphasized, kids are at public schools because they have to be, and parents have no ability to step in and protect them from mistreatment by others. Only teachers and administrators can do so. Now, to be sure, schools have to strike a balance between the First Amendment rights of free speech and their duty to create this secure environment conducive to learning, but that is exactly what the Olentangy schools have done here. They permit students to express their views generally about race, gender identity, and any other issue, even if those views can cause offense to others. The only thing they can't do is repeatedly make comments about these issues that are directed to a particular student, including by repeatedly and intentionally misgendering a classmate. Just because a student should be able to say that the body positivity movement is harmful and it encourages obesity, doesn't mean a school has to allow that student to call a classmate fat, even if it's... A practical question. Yes. I agree with a lot of things you said. I don't think the 17 of us will agree on the outcome, but we all agree that bullying is bad. You have a bullying policy, and it would cover, I think, all the examples you gave. I think it would cover the examples my colleagues on the bench gave about harassing conduct. So why did you need a policy that expressly called out transgender identity as opposed to just approaching those cases under a standard bullying policy? If there's intent to harass or bully, you deal with those on a case-by-case basis. Well, Your Honor, the policies that are at issue here are actually general. They do just talk about bullying and harassment. I think what PDE has challenged here is the application of those policies to intentional misgendering. You used the phrase transgender identity, right? That phrase is used. I think that gender identity is. I'm not sure, but I believe it's gender identity. Right. And so I think that what these policies do is they talk about divisive conduct and speech that could cause harm to others. The question about intentional misgendering, I think, came up through this kind of e-mail exchange with a parent. But the policies themselves are pretty general. What's wrong with saying? So the way I think about remedies is so they say that they want to say something, respectful use of gender based on biological sex. They send an e-mail asking if they could do that. The e-mail response, this is automatic bullying. What's wrong with a narrow injunction tied to the response of e-mail? And we don't even have to get into enjoining particular provisions of policies, just enjoying the idea that the use of pronouns based on biological sex itself is bullying. Well, Your Honor, I think that what the e-mail exchange was getting at is that intentional misgendering is an example, and I think this is what the e-mail said. That's an example of something that could constitute bullying and harassment. Obviously for it to actually rise to the level of bullying and harassment, it would have to be repeated. It would have to be intentional. But that's not what it says. It says it would be. So, I mean, I'm just puzzled. If your view is this overstated, why don't you just undo this language? I mean, they're allowed to rely on it. We all know what they're getting at. So why not just say, no, no, no, that's not what we meant? Sure, Your Honor. So I guess I'll make two points to that. I think the first point is that this was an informal e-mail exchange, and so I think that what the counsel for – It's no longer informal when there's a lawsuit. At that point, it's pretty easy to say, oops, we didn't mean it that broadly. We're not saying it's per se harassment to use biological sex pronouns. It's very easy to just say that. So I guess I'll go to my second point, which is that I think that the district's policy has not changed. The policy is – and I am happy to represent to the court, and if there's a tweak that needs to be made, as the district has already done, as this litigation has progressed, it will. But the more important point is that the fact that something can rise to a level of bullying and harassment doesn't mean that the district can't kind of proactively make sure that that issue – that it doesn't arise to that level, right? So Tinker and other cases have said, you don't have to wait for substantial disruption to happen. And I think what the school district's position is that intentional misgendering is kind of – can be a classic form of bullying. And our position is, we don't want students to do it because it could be harmful. Now, what always happens in schools, as I think any kind of teacher would attest, is that if someone does something once, you know, they don't get thrown in jail, it starts with kind of a talking to, right? So a teacher might pull a student aside and say, I saw you did this. That's really hurtful. They have the conversation and the student says, I'm sorry. You know, I'll do everything I can to avoid this. I'm trying to use first names. I sometimes slip. And your answer is if it happens again? That is not a violation of the policy. So unintentional is not – cannot rise to the level of bullying and harassment. Now, if it happens, you know, 15 times to the extent that – Well, intentional in the sense that is how they see it. I mean, that's the problem. So I would say intentional means that you're not doing it by accident, right? So intentional repeated misgendering is something that the school district believes rises to bullying and harassment. If it happens once – if it happens numerous times accidentally, that's not bullying and harassment, and no one would be punished for it. But when it happens intentionally and repeated, that's the type of conduct that the district is getting at. I also want to – my friends on the other side have talked about kind of the difference between, you know, ill will. They mean this respectfully. What I would point the court to is the Supreme Court's decision in the Morse, the bong hits for Jesus case, where the court said, you know, your subjective intent in speaking isn't really relevant. What matters is whether school administrators have reasonably kind of interpreted the language, how it could be read, and how it could reach others. And I think this court said the same thing in Defoe v. Spiva and said, you know, if racially divisive speech could have a racially harassing impact, does it really matter that you don't intend it that way? Because what schools are supposed to do, what they have a duty to do, is prevent the harmful effects of bullying. Did the school say that use of biological pronouns is presumptively harassment? Sure, though I think, Your Honor, that the policies do that by saying expressly that harassment and bullying is repeated, severe, and pervasive. That's part of the requirement for something to constitute bullying and harassment. So that's already in the policies that are 5517. It's in the Code of Conduct. It's in the definition of bullying and harassment under state law. That doesn't mean that the school can't take the position that this type of conduct is the kind of thing we don't want in schools. If someone calls a classmate fat once, that's something that the school can say, hey, cut it out, we don't like that. If it keeps happening over and over, that's when it rises to a level of bullying and harassment, and that's when someone might be punished for engaging in bullying and harassment. I know there were a number of questions about viewpoint discrimination, and I think that this is an area where it might actually be useful to clean up the court's case law a little bit for two reasons. One is that I think if you really look at the court's corpus of school speech cases, it's kind of zigzagged back and forth between viewpoint discrimination can be allowed, per se prohibited. The Barr decision kind of went through that history. Two months after Barr, the court issued a decision in NAL saying that Tinker is limited only to viewpoint-based speech. The Meriwether case, it wasn't a one-paragraph opinion that said, this is viewpoint-based. Game over. It went through the normal Pickering analysis. And I think if you look back at Supreme Court decisions, Tinker itself was clearly a viewpoint-based case. Someone was penalized for offering anti-war views, not pro-war views. Mahanoy was about speech critical of the cheerleading team, not complimentary of the cheerleading team. And if you had this kind of per se rule about viewpoint discrimination, that would mean a school can't stop the students from saying repeatedly, you're stupid, unless they also forbid students from saying, you're smart. And that doesn't make any sense, and that can't be the rule. I think viewpoint discrimination as a concept is already baked into Tinker. If you read Tinker repeatedly, the court said, you cannot prohibit speech based on your disagreement with the opinion unless it rises to a level of substantial interference with the educational process, substantial disruption to the school's operation. Is there any evidence of substantial disruption in this case? Your Honor, I guess I would make two or three points about the evidentiary record. I think that some of the colloquies earlier got to some of the evidence in the record. But I would say more fundamentally, I think the record in this case is a reflection of how it was litigated below. So PDE brought this lawsuit and a PI motion based on these kind of per se, unconstitutional on its face arguments. So the PI motion said, strict scrutiny applies in schools. It doesn't. Viewpoint discrimination is always per se, not allowed. It's not. I think that PDE responded in kind. And in fact, about a week after the school's counsel entered an appearance, PDE's counsel actually reached out and said, we want to stay on discovery because these issues are issues of law. And up through appeal, these are issues of law that the court will decide. So the position was really the facts don't matter. Are you saying there is a record, it just wasn't discovered before the policy was enacted? Well, Your Honor, when this case returns to the district court, because regardless, this is a PI motion, right, it's going to return to the district court no matter what this court does, it would go into discovery, summary judgment. Record first, speech suppression second. Is there a record? I mean, is there something to find? Absolutely. I mean, Your Honor, when this case returns, you know, this isn't an – There is evidence. Just to go back to my question, I get what's in the record. I'm just asking, is there evidence of substantial disruption upon which the school based its policy and sent the email? So let me answer that in two ways. The first is I'm not sure about what existed in 2012, 2013 when the policy was enacted. I haven't talked to the school district about that. I'm sorry to interrupt you, but just first answer yes or no. Is there evidence that you're aware of of this causing substantial disruption? Yes or no. Then you can give me any explanation. I'll be quiet. Yes, Your Honor. There is evidence that bullying, harassment, and intentional misgendering has a substantial interference with the educational process of students. So I think this is somewhere that it's important that substantial disruption is not limited to riots in the hallways. Frazier talked about a material interference with the educational process. The board, in this case, and the administrators in this case, hear from students all the time about the impacts of bullying. They hear from transgender students, cisgender students. So this is the kind of thing that the board looks at all the time. So when the case goes into discovery, absolutely there's going to be a record about that. There's also, I'm sure, going to be expert reports about the impact of intentional misgendering. Just to go back, because I get the bullying point. I'm not disputing that. Like Judge Riedler said, we all agree. I use misgendering, as you called it. Okay. Is there evidence of that such that it caused a substantial disruption? Yes. I'm really not trying to be opposite. The only reason I'm pushing back is because I think that I'm worried that you and I have a different definition of substantial disruption. So I don't think the law requires a showing that before creating a policy, you have to have shown that there was problems in the past. I think if you look at the Morse case, if you look at the Frazier, the court in those cases and this court's decision in Kaczynski, there wasn't a requirement of you have to have shown past issues with a concept like drug use in schools or bullying of teachers to show that a policy was necessary. I think courts have pretty uniformly allowed kind of general consensus on things that are harmful to students to be a basis for a material interference. Another thing that I think is really important. There's no record. Sorry. There's no record and none is required because it's common sense. That's what the panel said. So I think there is no record in this case now. When the case goes to summary judgment, there will be a record, as there is in virtually every other school speech case. They're almost all post-enforcement cases. I think whether you base this on the idea of common sense or on kind of the basic human experience that kind of bullying and harassment have a harmful effect and schools have a duty to prevent harassment and bullying, then there are expert evidence. What is the actual record that this actually happened at the Olentangy schools? I don't know the answer to that, Your Honor. I thought that's what I was asking you. I think there is a record that would be discovered about what the school board has heard from students and others about the impacts of bullying and harassment. I don't know about the particular instances. I know that there has been bullying and harassment at Olentangy schools, just as at probably every other school that has a middle school, a school district that has a middle school or a high school in the country. But I don't know what the record would look like. Obviously, that's something that would happen at the summary judgment stage. The other piece I think I would point to, Your Honor, is that there's kind of general broad-based agreement that anti-bullying and anti-harassment policies are generally constitutional. I think the only real question in this case is whether the school district's judgment that misgendering, whether of transgender kids, cisgender kids, PDE kids, or anyone else can cause the same type of harmful effects as bullying and any other form of bullying and harassment. And that judgment call... I think you've answered it, but I want to make sure I understand the question or the answer. Has anyone been disciplined under these bullying and harassment policies? Any kids been disciplined based on misgendering? No, Your Honor. This isn't something that has come up at Olentangy schools, that students have generally not been misgendering other kids. So what's the factual record going to show when it goes back if no one's been disciplined under these policies for misgendering as it relates to substantial disruption? I think what the evidentiary record would probably show is information from school board meetings and hearings and experiences of administrators that animated why counsel for the school district responded the way she did when she was asked, is this something that's allowed or not? So it's based on the experience of the board and the experience of school administrators, and that's what the basis would be. To get back to the point I was making about, you know, is this a reasonable judgment by the district? That is the kind of judgment call, the classic judgment call, that this court and the Supreme Court have repeatedly said that courts that school administrators get deference for. And so in Frazier, for example, the determination, the court said, you know, a determination of what manner of speech is inappropriate, it rests with the school board. The same in this court's decision in Kuczynski. The court said, you know, administrators need flexibility. They get a high degree of deference in the exercise of their professional judgment. I don't think that's a really good argument when it comes to the repeated use of it and when it comes with other features of what we would call harassment. I don't think that's an answer to the language of the email. And, you know, the only other thing I would say about enforcement, would they be disciplined? You know, for every student, the question isn't, will I be thrown out of school? I mean, some people just want to follow the rules. I mean, if that's the rule, I'm a rule follower. I'm not much of a rule follower. I'm married to one. So, yes, I'm going to follow the rules. The rules say that is discrimination. Those types of people are not going to do it. It doesn't matter that it takes two, three events, a few other circumstances to punish them. They're just not going to do it. And so I feel like I've been thinking about your prior answer, and I just want to give you a chance to respond to that thought. I'm happy to. I think you're right that they're not going to do it. And to be clear, that is the intention of the email and the school board and the school administrators. Just like calling a kid fat once isn't bullying and harassment, only if you do it repeatedly, that doesn't mean the school thinks it's okay to do it once. And so if a student does it once, a teacher is going to pull that kid aside and say, hey, cut it out. That's really mean. How would you feel if someone said that to you or to your sister? Just so you know, my perspective is that that's just astonishing. To say biological use of pronouns is by definition harassment, that's an astonishing concept to me. Well, Your Honor, what I would say is that first, I guess I'd point back to my prior answer about this is the kind of thing, whether something could rise to a level of bullying and harassment, that school administrators on the ground generally get deference to because they understand what type of impact conduct and speech has on students. That's the first point I'd make. The second point I would make. Sorry, and I want you to make the second point. But then why the categorical ban? Back to Judge Riedler's first question. That's fine. We're not saying they can't make those judgments on the ground, but why the categorical ban which forces students to withhold their own personal deeply held beliefs? I think that the reason for the categorical ban is the same type of reason that schools will tend to say, hey, cut it out if you say something mean to someone else, if you push a kid's books out of their hands. You don't list everything that's mean. You're right. It's these policies generally that talk about bullying and harassment. But, again, I would say that what the PDE has sought to adjoin is these policies, right, Policy 5517, the Code of Conduct, Policy 5163. As applied to this sentence. Right, as applied to this conduct, absolutely. But I think that what is pertinent is that this is the type of behavior that, if it happens repeatedly, can rise to a level of bullying and harassment. And the Supreme Court has said many times schools have a duty to prevent that from happening. It means that you don't have to wait until it gets really bad before you put a stop to conduct that causes harm to other people. And I think there have been a number of questions about the fact that students are allowed to express their viewpoints generally. You can wear a T-shirt that says there are only two genders, unlike in the Middleborough case. You can say I have a strong belief that marriage is between a man and a woman, that gender is immutable. You just can't, you know, direct that type of speech toward the particular student. What if someone's like gender fluid? They change their gender by the day. Can a student be disciplined for using the wrong ones? And how do they know? Right, so my first answer, Your Honor, would be that what you're describing sounds like kind of unintentional. And so unintentional misgendering is not covered within, it would never be considered bullying and harassment. The second point I'd make is that, I think this is a pre-enforcement challenge rather than post-enforcement where most of this case law really develops, is that the school district, if you look at the FAQ page that's in the record, it says that accommodations based on gender identity only occur when someone's gender identity, if it doesn't match their birth sex, is consistent, insistent, and persistent. So I don't know of something happening with someone changing their gender by the day. If that arose, I guess the court could address it then. But here we're talking about a population of people that have a gender identity that's persistent and insistent and consistent. But could you add to that, in your school system of 23,000, 24,000 students, that population is less than a quarter of a percent, right? Yes, so there's about 24,000 students in the school district, 29 schools, less than 50 kids who identify with pronouns that don't correspond with their birth sex. So that's an average of one and a half kids per school. I think that goes, in part, to the compelled speech question, that unlike not living in a car, living in New Hampshire without a car, which makes it impossible to basically do anything in your life, this is not the kind of thing that I think occurs every day. But it's a... If my memory corrects it, the request was to be able to confront the student and call the student by his biological pronoun, correct? It was speech that's directly targeted at a student. And I've heard some members... Yes? I'm just a little confused, and maybe you can help clarify. I understand this email that happened earlier, but then I also understand that the board made revisions to the policy to make it clear that people couldn't actually get in trouble unless their speech rose to the level of bullying or harassment. And looking at the definition of harassment, for example, in the policy, it has to be punished under it that you actually have to... Has the effect of substantially interfering with the student's educational performance or has the effect of substantially disrupting the orderly operation of the school. Bullying has to be severe or pervasive enough to create an intimidating hostile environment. So, I mean, is it right to say nobody can actually get punished unless it meets these standards? Yes, it's right to say... And those kind of qualifiers in the policies that you were referring to, those have actually always been in the policy. So it's absolutely correct to say that no one can commit harassment or bullying in Olentangy schools and be punished for it unless they do this repeatedly, intentionally. It is also correct to say that the schools don't want students doing this at all because it really has a harmful impact on others, just like name-calling or teasing. The fact that it has to be repeated and pervasive doesn't mean you can stop it before it gets that bad. You can't stop it before it gets that bad. Fraser and other cases from this court and the Supreme Court have said repeatedly you have a duty to prevent harm from occurring. You don't have to wait for the substantial disruption to take action because the duty of schools is to create a safe learning environment for students and to protect them because kids can't protect themselves in that situation and parents can't step in and remove them from the situation. Kids are there because they have to be. Well, even if you don't have to wait for the substantial disruption, I'm having a hard time following what you mean when you say... Because you said... I mean, I get that what you're saying is that, well, this has never happened, it hasn't been enforced, and so we don't have any evidence of a specific disruption that happened in the past. However, what we have is administrators who know what happens in schools and how it impacts students, but there's no evidence in the record concerning that at the preliminary injunction phase, right? So what are we to do? What are we to do? We take you at your word? I guess I want to understand what the contours of what you think your evidentiary burden is at the preliminary injunction stage to show the possibility of, at least, and I'm going to put it like that, it's probably a little bit atextual, but of substantial disruption. So what I think the court would do is it would say, the court would say that this is an anti-bullying and anti-harassment policy that at the PI stage is that school administrators can reasonably determine that misgendering is the type of thing that can cause substantial harm and decline to enjoin and affirm because it's the type of thing that we generally give deference to school administrators about or the court can say, there actually is evidence in the record in this case that supports the policies, whether from the PDE declarations themselves, which I think acknowledge that this is the type of intentionally misgendering will be offensive and humiliating to students to whom that is targeted from the article that PDE put into the record from cases... I think Judge Strach mentioned earlier in her questioning. Right. Also, the First Circuit's decision in Doe v. Boyertown, which talked really extensively about the harm of misgendering on students and I think the court can also look to this court's cases like Tuminello, which acknowledged the harms that bullying can cause and from there, if we accept that bullying can be prohibited, then this is really only about the kind of narrow question of whether the school district made an unreasonable determination that intentional misgendering is the kind of thing that can cause that same type of harm. And so I think that that's what the court would do and what I would say is if this court is really concerned about the evidentiary record, what I would suggest the court do is to vacate and remand with some guidance about what is allowed in the school context. I think at that point, this case would... and maybe say, okay, the PI motion needs to be replaced and you have to have evidence to support it because the way this case was litigated in the trial court was as a purely legal dispute. PDE didn't make any of these arguments about evidence and again, it sought to stay discovery so there wouldn't be any evidence in the record and so I think that would be very useful and we absolutely wouldn't protest that result. One more question and then we'll hear rebuttal. Just real quick, you keep asking for deference and I understand why the school would want deference to make these kinds of judgments but can you explain how that's consistent with Tinker? Because the school district there used its judgment to say having these armbands is going to be disruptive to our community and the Supreme Court said no, you don't get deference in evidence. Absolutely, I would be happy to. I think that when schools implement really broad prohibitions on general speech that have a really significant intrusion, forbidding any type of general speech about a particular issue, courts have generally demanded a pretty high evidentiary standard because I think there's every reason in that context to think, you know, this might just be disagreement with the message being expressed but where the speech restriction is much more narrow, like it is here, really only focuses on the type of speech that the school thinks will cause the most harm, the kind of personal thing directed at someone that just hits differently, then courts have not required that type of evidentiary showing and I can point to this court's Kaczynski decision. I'll point to the Bong Hits for Jesus case and Frazier. There was no significant evidentiary record. The court in the Morse case looked at kind of general consensus about drug use In those contexts, there's long-standing general consensus that drug use was illegal. I mean, there's not long-standing consensus here in society as to that a person can identify differently than their biological sex. Your Honor, there is long-standing consensus of kind of the harms of bullying and harassment and I think there's also long-standing The issue is regulating the way someone refers to another person in general vocabulary that's been accepted forever in our society up until about 15 years ago. Sure, Your Honor. So you're saying you're going to common sense but you're discounting hundreds of years of common sense that many people continue to believe is common sense today in favor of another view of common sense that another segment of society has believed in for about 15 years. Your Honor, I think that beside that initial piece of common sense, it's also, I think, generally lived human experience that referring to a skinny, unathletic boy who has a high voice as a girl or as a she is really harmful. That's kind of the classic bullying that's existed as long as there have been middle schools and I think from there, it's completely logical to understand or to believe that that same harm exists for kids whose gender identity doesn't match their birth sex as it does for those whose gender identity does match their birth sex. I think that's the type of judgment call that school administrators in the halls of schools and in the lunchroom every day that they have the best understanding of and that they need some flexibility and leeway to deal with those situations in schools. Thank you. Thank you, Your Honor. We'll hear rebuttal from Mr. Norris. Thank you, Your Honors. I will be brief. Number one, I heard my friend say there is no record of disruption. That is an accurate statement. They put in zero evidence. I don't think a school, even if it had submitted and endorsed and said your evidence is our evidence, that would not be nearly enough under Tinker. This is the testimony of three parents who said they understand and transgender students believe this language is offensive, but we disagree and our religion teaches us differently. Under Ashcroft v. ACLU, it's a Supreme Court opinion. It says our burden was to show that this speech is protected. Once we did that, it is the government's burden to prove that it satisfies the requisite level of scrutiny. If there is no evidence or the evidence is in equipoise at the preliminary injunction stage, the plaintiff is entitled to a preliminary injunction. You don't send it back to let them do a do-over. It means that we were entitled to that relief. There is always a lot of talk in these cases about giving deference to schools. Schools do have a lot of expertise in what it takes to educate students, but deference in a case where the school won't even prove to you that it made a judgment based on its own expertise about why this policy was needed is inappropriate. It does not fit within those cases. Deference has to be exercised in order for it to be honored by courts. If this were enough, if they had needed no evidence, they could rely on what we think are misreadings of our declarations in a newspaper article that wasn't even about Olentangy. If that's enough, then that means a school could adopt, as Meriwether pointed out, the opposite policy and ban preferred pronouns. It could use just as much common sense to justify that policy if there was no evidentiary record required. Number two, there was talk... Is it the agreement not to treat this as a factual matter and an agreement to stay discovery fit in that argument? I'm not exactly sure what my friend is talking about. When there's no discovery on a preliminary injunction motion, that makes us vulnerable. That means the school gets to load up the record with all of the untested declarations and evidence and minutes and testimony and legislative findings. That's what normally happens if they put that evidence in. I thought the agreement was to make this purely a legal issue and not go forward with any discovery or exchange of discovery. Is that incorrect? I don't recall any such exchange anywhere, Your Honor. If it's purely legal, it's because they didn't have any evidence to justify this policy. Using declarations if that was the case? They could use it just as easily as you. Correct. I think my friend is putting a gloss on an email from us that said let's not do discovery. Let's go forward with our own evidence. That is not the same thing as saying there are no facts in dispute. That's not for us to decide anyway. That's for the district court to decide. We put in our declarations. Every speech case I've ever litigated, the school has at least a declaration from a school official explaining what they were thinking when they adopted this policy. That's missing here. Just one more point, which is we talked about hypotheticals involving repeated or in-your-face speech. Look at the discriminatory language policy in the Code of Conduct. It does not require the speech to be targeted, directed, be about a student at the school. It could be about a group. It could be about someone who doesn't even attend the school. It doesn't have to be severe, pervasive, repeated. None of those limitations are in the policy. My friend talks a lot about harassment and discrimination. None of those words appear. Sorry, harassment and bullying, none of those words appear in the discriminatory language policy either. It's facially overbroad. Thank you very much for all three of your excellent arguments and for answering our questions, which we're always greatly appreciative of, and thank you for your excellent briefs. The case will be submitted. We will have, I don't know whether brief or long adjournment, but we will be conferencing this case before we hear the General Motors case.